# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RYAN FRANCO, individually and on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FANDUEL, INC., DRAFTKINGS, INC. and FANDUEL DEPOSITS, LLC,<br><br>Defendants. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Case No. 15-cv-9902 |

Plaintiff Ryan Franco ("Plaintiff"), individually, and on behalf of all others similarly situated, by and through counsel, brings this action against FanDuel, Inc. ("FanDuel"), FanDuel Deposits, LLC ("FanDuel LLC"), and DraftKings, Inc. ("DraftKings"), (collectively "Defendants"), and states as follows:

## NATURE OF THE CASE

1.      This is a class action complaint against FanDuel and DraftKings, as well as their subsidiary companies: companies operating daily fantasy sports ("DFS") websites in a manner that violates New York law.

2.      Defendants operated DFS contests in which entries were made by competitors with access to advantageous, non-public information or data.

3.      Defendants advertised their contests as "fair" and skill-based despite allowing employees from other DFS websites and others to also compete while in possession of material,

non-public information.  Defendants operated their contests without disclosing to competitors that it allowed such participation.

4.     DFS is an industry in which individuals compete against others for prize money. Defendants operate such contests, which are won when competitors accumulate a large number of points based on the real-life statistics of athletes in professional sporting events—for example baseball, football, basketball, and ice hockey—that occur on a particular day or week.

5.     DFS is a multibillion-dollar industry dominated in the U.S. by DraftKings and FanDuel, which account for 95% of the market.  At the start of the 2015 NFL season, DraftKings and FanDuel spent more than $100,000,000 on television ads and became two of the top television advertisers in the United States.  As a result of this advertising blitz, Defendants added millions of new users.

6.     For years, the DFS industry operated without regulation.  Once the unlawful actions of Defendants, detailed herein, were recently exposed, Attorneys General, Federal Agencies, and States initiated efforts to regulate Defendants' operations.

7.     Defendants generate revenue and profit by taking a fee—known as a "rake"—from contest prize pools. While the prize pools are funded from competitors' entry fees, Defendants often guarantee prize pools and will pay out the difference between the guarantee and the entry fees.  The difference between the entry fees in the prize pool and the guarantee is called the "overlay."  The overlay gives Defendants additional incentive to attract as many entries as possible into contests to avoid having to pay out the overlay.

8.     New competitors are referred to as "fish," and Defendants rely on their participation to fund the prize pools and keep their most active users—so-called "whales" who generate the most entry fees—on their websites.  According to one analysis, the top 1.3% of

players paid 40% of the entry fees, and the most active 6.3% of players paid 76% of entry fees. During the first half of the recent Major League Baseball season, these whales swallowed 90 percent of all winnings.

9.      The CEO of FanDuel recognized the need to attract as many new, inexperienced competitors as possible to keep its whales happy.

10.     Unknown to Plaintiff and proposed class members, many of the whales were, in fact, DraftKings and FanDuel employees.  DraftKings allowed its employees to participate in contests hosted by FanDuel and vice versa.  Defendants allowed their employees to use material, non-public information obtained in the course of their employment to gain an unfair advantage over competitors who did not have access to such information.

11.     Employee competitors enjoyed tremendous success in competitions while armed with non-public data.  One employee in particular exploited his access to DraftKings' non-public information to win a three-hundred-fifty-thousand-dollar ($350,000) cash prize in a FanDuel contest.

12.     DraftKings promoted its contests as skill-based and fair despite high levels of participation and unusual levels of success in the same contests by employees of FanDuel and vice versa.  Both Defendants concealed employee participation in contests from Plaintiff and proposed class members, and they conspired with each other for mutual unlawful profit.

13.     Defendants fraudulently induced Plaintiff and the proposed classes to pay to compete in their contests.  Defendants profited from inflated levels of participation from "fish" who were devoured by "whales" and others armed with access to advantageous, non-public information.

14.     According *The New York Times*, competing in DFS while in possession of non-public information "is absolutely akin to insider trading . . . . It gives that person a distinct edge in a contest. . . . The single greatest threat to the daily fantasy sports industry is the misuse of insider information.  It could imperil this nascent industry unless real, immediate and meaningful safeguards are put in place."  For Plaintiff and members of the proposed classes, such safeguards came too late.

## PARTIES

15.     Plaintiff Ryan Franco is a citizen and resident of Hillsdale, Bergen County, New Jersey.

16.     Defendant DraftKings, Inc., is incorporated in Delaware with its principal place of business in Boston, Massachusetts.

17.     Defendant FanDuel, Inc., is a Delaware corporation with its principal place of business in New York, New York.

18.     Defendant FanDuel Deposits, LLC, is a Delaware limited liability company with its principal place of business in New York, New York.

19.     Upon information and belief, Defendant FanDuel Deposits LLC was created recently for the purpose of holding funds from FanDuel.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  There are at least 100 members in the proposed plaintiff classes, the aggregated claims of the individual Class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action in which Defendants and class members are citizens of different states.

21.     This Court may exercise jurisdiction over Defendants because they are registered to conduct business in New York; have sufficient minimum contacts in New York; and intentionally avail themselves of the markets within New York through the promotion, sale, marketing, and distribution of its contests, thus rendering the exercise of jurisdiction by this Court proper and necessary. Moreover, Defendants' wrongful conduct (as described below) foreseeably affects consumers in New York.  FanDuel is headquartered in New York, New York.

22.     Venue is proper in this District under 28 U.S.C. § 1391, because FanDuel resides in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here.

## SUBSTANTIVE ALLEGATIONS

23.     Plaintiff, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to himself and information and belief as to all other matters.  A reasonable opportunity for discovery will uncover substantial evidentiary support for the allegations set forth herein.

### Daily Fantasy Sports

24.     In traditional fantasy sports, competitors create teams of athletes and manage those teams throughout a season by using their skill and knowledge to set lineups, add or drop athletes from the team roster, and/or trade with other fantasy competitors.

25.     DFS evolved from traditional fantasy sports in that Defendants hold contests over the course of one week or a single day, rather than an entire season.  DFS competitors compete by choosing a lineup of professional athletes at certain positions until they reach a "salary cap" for the lineup.  The goal is to select the highest scoring combination of athletes in a given day or week under the allotted salary cap.  Competitors then enter their lineup into contests in the form

5

of head-to-head matchups and/or tournaments.  Many contests allow multiple entries, and competitors—especially the most active "whales"—often enter numerous lineups made up of different combinations of athletes.

26.     DFS contests may have entry fees as low as 25 cents and as high as $5,300.  They are more akin to a casino sportsbook than traditional fantasy sports.  The competitors whose lineups scored the most points—based on the real-life statistics of the professional athletes—win a share of a pre-determined prize pool, which can be in the hundreds of thousands or millions of dollars.  Competitors who enter multiple lineups can win money for each lineup that places amongst winning entries.  DFS competitors do not have the same ability to add/drop athletes and/or complete trades, as in traditional fantasy sports.  Because DFS contests take place over a short period of time—compared to traditional fantasy sports—competitors' skill and knowledge play a far lesser role in impacting their chances of winning.

27.     DFS exists due to a loophole in the Unlawful Internet Gambling Enforcement Act ("UIGEA"), which provides that fantasy sports are exempt from its prohibition on gambling if: (1) they are not dependent solely on the outcome of a single event or a single individual's performance; and, (2) the chances of winning are due to the skill and relative knowledge of the participants.  The DFS industry was not prevalent when the UIGEA was passed.  Defendants have avoided regulation applicable to gambling and similar businesses by falsely labeling their contests as games of skill.

28.     Defendants both state on their websites that they operate contests of "skill" in which winners "are determined by the individuals who use their skill and knowledge of relevant sports information and fantasy sports rules."  Likewise, Defendants' advertisements falsely label their DFS contests as a "game of skill" in which competitors have a fair opportunity to use their

6

knowledge to win.  For example, DraftKings advertised, "every week, use your knowledge and showcase your skills . . . you like football, you like winning."  In another commercial in August 2015, DraftKings advertised its website as "a game within the game, that requires a different set of skills . . . we don't just play, we are players, we train, and we win."  Similarly, FanDuel advertised that competitors could "get paid for [their] knowledge" if they were "smarter than the average fan."  According to one report, DraftKings has promised to spend $500,000,000 on advertisements with ESPN and Fox Sports over the next two years.

29.     Despite labeling and advertising its contests as games of skill, in a comment on the website *Reddit*, DraftKings CEO Jason Robins described his company's contests as "betting" and stated that the concept is "almost identical to a casino..[sic] specifically Poker.  We make money when people win pots."  He referred to payments on DFS websites as wagers and bets. Similarly, DraftKings applied for and obtained licenses to operate "Gambling Software" and "Pool Betting" from the United Kingdom Gambling Authority.

30.     Defendants' advertisements do not disclose that Defendants' employees and others have access to non-public information that provides them with unfair advantages over competitors without access to the same information.

31.     DraftKings' "Terms of Use" also misstated the integrity of its contests while omitting any disclosure of the fact that it permitted employees from other DFS websites and others with access to non-public information to compete in its contests.  The "Terms of Use" stated, "From all entries received for each Contest, winners are determined by the individuals who use their skill and knowledge of relevant sports information and fantasy sports rules to accumulate the most points according to the corresponding scoring rules.  FanDuel's "Terms of

Use" included a nearly identical statement that also failed to disclose participation in its contests by DraftKings employees and others with access to advantageous, non-public information.

32.     Defendants both falsely and misleadingly reassured competitors that they would police the integrity of their contests. DraftKings' "Terms of Use" stated, "The Company, at its sole discretion, may disqualify any entrant from a Contest, refuse to award benefits or prizes and require the return of any prizes, if the entrant engages in conduct the Company deems to be improper, unfair, or otherwise adverse to the operation of the Contest or is in any way detrimental to other entrants." FanDuel's "Terms of Use" included a nearly identical statement and its "Rules" stated, "There are a variety of behaviors that are detrimental to FanDuel and other players on the Service. Engaging in those behaviors may result in suspension of some or all functions associated with your account. Suspended players are expected to respect the disciplinary actions imposed on their accounts . . . ."

33.     Defendants' advertising and statements were false, deceptive, and misleading by failing to disclose the fact that the odds of winning a contest hosted by Defendants were skewed against ordinary competitors due to the fact that Defendants' employees and others participated in the same contests while having access to material, non-public data, which provided strategic advantages. Defendants' advertising and statements were also false, deceptive, and misleading for misrepresenting that Defendants' contests were "fair" and skill-based.

34.     DraftKings reported $304 million in entry fees in 2014 while FanDuel reported $621.7 million. *Business Insider* reported that the DFS industry would seize $2.6 billion in entry fees in 2015. The industry is expected to grow 41 percent annually, reaching over $14 billion in 2020.

**Value of Non-Public Information and Exploitation of the Same**

35.     DraftKings attracts players "who are analytical and favor data and research."
DraftKings CEO Jason Robins described his company as similar to "the stock market."  Just as
information and data is vital when valuing companies on the stock market, information and
data—*e.g.*, injuries, past performances, and projected statistics—is crucial in DFS when valuing
athletes and setting lineups.  Although some information is public, other data is not.  Defendants'
employees have access to material, non-public data, including various lineups chosen by other
competitors, the frequency of those lineups, detailed analytics on winning strategies, how lineups
from one DFS website would do if entered in contests on another DFS website, and data
identifying low-owned or undervalued athletes.  Access to this information provides Defendants'
employees with a competitive advantage over other competitors, including the ability to set
lineups with enough athletes different from other competitors' lineups.

36.     Defendants use proprietary valuation systems to set the individual salaries for
athletes.  The DFS industry website Rotogrinders.com explained the value of this data: "The
reason that the distribution of salaries matters so much is that you should be thinking of each
pick not in terms of what you gain, but rather what you lose.  When you select a particular
player, you lose a certain amount of cap space that could otherwise have been applied to other
positions.  Thus, you want to search for large deviations in projected points that aren't reflected
in salaries."  Possessing insight into which athletes are over or undervalued in a given day or
week provides a substantial advantage over competitors without such information.

37.     DraftKings knows the value of non-public data and knows that it should not be
shared: "The reason that I don't want to give the actual numbers is because I believe it creates a
slippery slope where people start requesting stats on win rates of various strategies, which I

believe is not a positive thing . . ."  Robins admitted in an interview with ESPN that
"[i]nformation like that would give people an advantage . . . if it's information that others don't
have and it pertains to the game."  He also admitted that DraftKings employees have access to
"[d]ata that could give players an advantage."  Both Defendants admitted that their employees
have access to material data such as ownership percentages of players.  This information can
inform employees' selection strategy when competing in DFS contests.

　　　　38.　　FanDuel also knows the value of non-public data and knows that it should not be
shared.  Through the following language, FanDuel's "Employee DFS Information and Playing
Policy" acknowledges its employees' ability to exploit non-public data:

- Limit ability of employees to exploit "inside information" such as the picks of top
  users, or the win rates of potential opponents.
- Reduce chance of users questioning ability of employees to exploit inside
  info[rmation] against them when they play on other sites.

- Minimize internal flow of exploitable information where possible, so that there are
  fewer opportunities for exploitation.

The policy also cites the "real threat" that its employees target weak users as opponents on other
DFS websites, because "[i]nformation that is known can't be unknown."  FanDuel's policy lists
rules applicable to its employees who compete on other DFS websites, which are, in effect,
strategies for concealing the practice:

- Never be among the top five players by volume on any one site . . . Never be among
  the top ten overall on the RotoGrinders leaderboard.  Top players frequently become
  targets for accusations by other users.

- Never account for more than 2% of entries in any tournament of more than 1,000
  entries.  Never account for more than 5% of entries in any tournament of more than
  100 entries.  Players who swamp big tournaments with entries frequently become
  targets of accusations.

- Don't be the 2nd person into a head to head contest against the same opponent in more
  than one contest per day.  This rule will greatly limit the ability to exploit information
  about user performance, and will also limit the likelihood of complaints from users.

• Seek to avoid playing anyone whose lineups you saw for that time period.

39.     On or about September 27, 2015, a DraftKings employee accidentally posted ownership data—the "percentage owned chart" for the Week 3 Millionaire Maker competition, which displayed the percentage of competitors who "own" each player in their lineup—on DraftKings' blog, *before* all of competitors' lineups were "locked," meaning the lineups could still be changed.  Possession of this type of data when lineups can still be changed is advantageous, because DFS contests reward, *inter alia*, selection of lineups that have not been widely chose by other competitors.

40.     This employee initially claimed he was "the only person with this data and as a [DraftKings] employee, am not allowed to play on site."  He later stated that the error was "100% my fault" and that "we'll be putting checks in place to make sure it doesn't happen again."  This statement is an admission, imputable to DraftKings that sufficient "checks" did not exist prior to the data's release.

41.     Nevertheless, on or about October 4, 2015, the same employee competed on FanDuel and placed second in the Sunday Millions contest.  He won $350,000 after besting 229,883 other competitors.  The lineup he chose had nearly identical usage rates on both FanDuel and DraftKings, meaning that Defendants' data correlated, and his access to non-public DraftKings data would have provided him with a strategic advantage over other competitors who did not possess the same data.

42.     Moreover, *Larry Brown Sports* published an analysis of the same employee's remarkable success in DFS contests after moving from a job covering DFS with Rotogrinders.com to inside DraftKings.  Indeed, out of his 100 best contest results, as listed on his RotoGrinders profile, 83 were on FanDuel.  And he won major cash prizes in Major League

11

Baseball contests on FanDuel in 20 of 31 days in August 2015, including three first place finishes and numerous additional top ten finishes.

43.     The law firm Greenberg Traurig LLP subsequently conducted an independent investigation into the employee's use of inside information in the contest in which he won $350,000.  Greenberg Traurig concluded that the employee did not misuse inside information, but no detail was provided regarding the employee's use of non-public information in the baseball contests in which he won major cash prizes.  The investigation did not address whether other DraftKings employees who competed in DFS contests misused non-public information to gain an unfair advantage over competitors without such information.

44.     This employee is not alone.  ESPN's investigative program "Outside The Lines," reported—based on a statement by a FanDuel representative—that DraftKings employees had won up to $10 million in contests on FanDuel.  On information and belief, FanDuel employees have won a comparable amount in DraftKings contests.  Indeed, *The New York Times* reported that DraftKings and FanDuel representatives have acknowledged that their employees are first and foremost competitors in DFS contests and have continued to compete on each other's respective websites after beginning their employment.  *The New York Times* cited a statement by the co-founder of DFS Report, Ben Brown, that a FanDuel employee with access to its internal data had played on DraftKings, which was confirmed by a FanDuel spokeswoman.  According to *The New York Times* report, that employee won over fifty thousand dollars ($50,000) on DraftKings.

45.     According to Legal Sports Report ("LSR"), an "industry insider who wished to remain anonymous told LSR that 'a significant number of the whales at the top DFS sites are

employees—often executives—of other sites.'"  FanDuel's CEO admitted to personally playing on competitor sites.

46.     On October 11, 2015, *The New York Times* also reported that, during a private DraftKings party, an ordinary DFS competitor named Madison Calvert was discussing his choice of pitcher in a baseball contest with Jon Aguiar, a DraftKings executive, when Aguiar "suddenly made a quick check on his phone, and to Calvert's surprise, informed him that his pick of a pitcher was a poor choice because many other players had selected him.  'I shouldn't have pulled that up in front of you, ha-ha," Calvert said Aguiar told him."  Also that day, Calvert realized he had been challenged in a head-to-head contest by a business-planning manager at DraftKings named Rick Sawyer.

47.     Leonard Don Diego, a former employee of FanDuel and current employee of DraftKings, has also been accused of sharing lineups.

48.     DraftKings was well aware of its employees competing in FanDuel contests and aware that some of its employees made more money from winnings on FanDuel than their actual salaries at DraftKings.  By permitting such participation, Defendants skewed the odds of winning against competitors without access to material, non-public information.

49.     Robins admitted that he "had reservations" about allowing employees to play on other sites and allowing other sites' employees to play on his site, and even spoke to his competitors about ending the practice, but ultimately decided, in concert with his competitors, to continue the practice.  Robins said, "And I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have policies such as this one in place."

50.     Defendants also permitted other individuals with access to non-public information to compete in its contests.  Until recently, sports insiders such as athletes, team doctors, team trainers, spouses, referees, officials, and family members of athletes could compete in Defendants' contests while possessing access to non-public information like athletes' injuries, disciplinary issues, and/or participation in a given athletic event.  Moreover, referees and officials can directly impact athletes' real-world performance, which also decreases the prospects of winning a DFS contest for ordinary competitors.  On September 16, 2015, the website ThinkProgress.org reported that there are not sufficient rules in place to prevent team employees (*e.g.*, doctors and trainers) and athletes' family members from exploiting non-public information about injuries or playing time, which could provide an advantage to DFS competitors armed with such information.

51.     DraftKings and FanDuel lacked sufficient internal controls to bar their employees' access to material, non-public data for purposes outside the scope of their employment, including their personal use while competing in contests on other DFS websites.  Likewise, Defendants' lacked sufficient controls to bar others from competing in their DFS contests with armed with advantageous, non-public information.  Defendants permitted such use and participation during the Class Period.  Defendants released a joint statement restricting their employees from competing on each other's websites only following disclosure of the fact that employees with access to non-public data were winning large amounts of money on other DFS websites.

52.     Ordinary DFS competitors—those without access to non-public information— were not provided a level playing field that allows them to fairly use their skill and knowledge to

prevail in Defendants' contests, because Defendants' employees and others with access to non-public information were allowed to compete in the same contests up until October 2015.

53.     Defendants were unjustly enriched by seizing increased entry fees from "fish" competitors and others who were unaware of the foregoing activities.  Defendants also benefitted by offering their employees the undisclosed "perk" of a material, undisclosed advantage while competing on other DFS websites, which allowed Defendants to pay such employees less in salary or wages than they would have had to pay them.  Defendants did nothing to prevent this enrichment, and, in fact, knowingly conspired to seize it.

54.     Before competing in DraftKings contests, Plaintiff encountered Defendants' representations that DFS contests are skill-based and that all competitors had a fair opportunity to use their skill and knowledge to win.  Plaintiff reasonably believed at the point of sale that the DFS contests he entered would be fair.  Overall, Plaintiff paid $199.00 for entry into DraftKings contests before the disclosure of the fact that DFS employees were competing while armed with an unfair advantage in the form of non-public information and data.

55.     Had Plaintiff and/or members of the proposed classes known that Defendants were working in concert to allow employees of DFS sites and others with access to non-public information to compete against them, Plaintiff and members of the proposed classes would not have paid to compete on Defendants' websites.

56.     Had Plaintiff and/or members of the proposed classes known that Defendants had acted in concert to sanction this practice, Plaintiff and members of the proposed classes would not have paid to compete on Defendants' websites.

**Reaction to Disclosure of Defendants' Unlawful Practices**

15

57.     On October 6, 2015, Major League Baseball—an exclusive partner of and investor in DraftKings—issued a statement saying, "Major League Baseball has a policy that prohibits players and employees from participating in fantasy baseball games in which prize money or other things of value are available to participants.  We were surprised to learn that DraftKings allowed its employees to participate in daily fantasy games.  We have reached out and discussed this matter with them."

58.     On or about October 14, 2015, the U.S. Department of Justice and the Federal Bureau of Investigations opened investigations into Defendants' operations.

59.     The New York Attorney General's Office sent letters to Defendants, writing: "The integrity of [Defendants] and [their] policies and practices are matters of concern to the public, particularly to the many customers who put money at risk on your site[s] each day."  The Office also requested from Defendants internal data, including information concerning the employees responsible for aggregating statistics and athlete pricing algorithms, details regarding the storage of such data, and copies of employee policies and procedures.  On November 10, 2015, the Office issued cease-and-desist letters ordering Defendants to stop accepting wagers in New York State.  The Office also said that Defendants' advertisements "seriously mislead New York citizens about their prospects of winning."  *The New York Times* reported that Attorney General Eric T. Schneiderman said, "It is clear that DraftKings and FanDuel are the leaders of a massive, multibillion-dollar scheme intended to evade the law and fleece sports fans across the country."  On November 16, 2015, DraftKings and FanDuel filed requests for a temporary restraining order to stop the Office from shuttering their websites in New York.  Hours after the requests were filed, a New York state court judge denied the requests.

60.     On October 16, 2015, the Nevada Attorney General suspended Defendants' operation in the state until they obtain licensure.  Regulators in numerous other states have also questioned the legality of the DFS industry.

61.     On October 20, 2015, the NCAA sent Defendants a letter requesting them to confirm whether any referees or officials have participated in DFS contests.  Defendants agreed to do so.

62.     A federal grand jury is being convened by the U.S. Attorney's office in Tampa, Florida whose reported purpose is to consider whether DFS operators are in violation of Florida and federal anti-gambling laws.

63.     Congress will hold hearings to examine the integrity and legality of the DFS industry.

64.     Ultimately, Defendants together changed their Terms of Use to prevent their employees and others who could possess non-public information (*e.g.*, athletes, coaches, team employees, and referees) from competing in their DFS contests.

65.     When asked in an interview why Defendants did not ban their employees from competing in DFS contests on competing websites, Robins said, "[c]ertainly we may have been late to the game on the employee ban—and hindsight 20/20, *that's something I admit we should have done before*" (emphasis added).

## CLASS ALLEGATIONS

66.     Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following proposed "Nationwide Class":

> **All persons residing in the United States who, before October 6, 2015, paid to compete in DraftKings or FanDuel DFS contests in which other entries in the same contests were made by individuals possessing advantageous non-public information or data.**

67.     Plaintiff also seeks to represent a "New Jersey Subclass" defined as follows:

**All persons residing in New Jersey who, before October 6, 2015, paid to compete in DraftKings or FanDuel DFS contests in which other entries in the same contests were made by individuals possessing advantageous non-public information or data.**

68.     Excluded from the proposed Class are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer, director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel for Plaintiff in this action; any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to either of them, as well as the spouses of such persons; and members of the judge's staff.

69.     This action has been brought and may properly be maintained on behalf of the class proposed above under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

70.     Members of the proposed class are readily ascertainable, because the class definition is based upon objective criteria.

71.     **Numerosity**: thousands or millions of competitors competed on Defendants' websites.  Members of the proposed class are thus too numerous to practically join in a single action.  Class members may be notified of the pendency of this action by mail, supplemented by published notice (if deemed necessary or appropriate by the Court).

72.     **Predominance**: Common questions of law and fact exist as to all members of the proposed class and predominate over questions affecting only individual class members.  These common questions include, without limitation:

a.      Whether Defendants' representations to the public about their DFS contests were false, misleading or unfair;

b.      Whether Defendants fraudulently induced Plaintiff and the proposed classes into

using their website under false pretenses, through material misrepresentations or material omissions;

c.      Whether Defendants' conduct violated the New Jersey Consumer Fraud Act and the New York Deceptive Acts and Practices Law;

d.      Whether Defendants' Terms of Use are unconscionable, illusory, fraudulent or otherwise invalid;

e.      Whether Defendants had in place sufficient safeguards to block those possessing competitively advantageous, non-public information from competing in their contests;

f.      Whether DFS competitors had a fair opportunity to win DFS contests; and

g.      Whether Defendants' employees used non-public information or data to gain an advantage in DFS contests, whether Defendants acted in concert to condone, allow or promote this practice, or whether Defendants were negligent in allowing employees to access and use confidential data, or were negligent or committed fraud in failing to disclose to Plaintiff and the proposed classes that these practices were occurring.

73.     **Typicality**: Plaintiff's claims are typical of the claims of the proposed class. Plaintiff and the proposed class were induced to use Defendants' websites based on false and misleading advertisements of fair play and lack of information about having to compete against competitors who possessed inside information, giving rise to substantially the same claims.

74.     **Adequacy**: Plaintiff is an adequate representative of the proposed class, because his interests do not conflict with the interests of will fairly and adequately represent and protect the interests of the members of the class he seeks to represent.  Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously by monitoring and directing the actions of class counsel.  The interests of members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

75.     **Superiority**: A class action is superior to other available means for the fair and efficient adjudication of this dispute.  The injury suffered by each class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible.  Even if Class members themselves could afford such individualized litigation, the court system could not.  In addition to the burden and expense of managing many actions arising from Defendants' actions, individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case.  By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

76.     In the alternative, the proposed Class may be certified because:

a.      the prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent or varying adjudication with respect to individual class members which would establish incompatible standards of conduct for Defendants; and

b.      the prosecution of separate actions by individual class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

### FIRST CAUSE OF ACTION
**Negligence**
**(Plaintiff individually and on behalf of the Nationwide Class)**

77.     Plaintiff, on behalf of himself and the proposed class, hereby re-alleges the paragraphs above as if fully set forth herein.

78.     Defendants owed duties to Plaintiff and the proposed class as users and paying customers of their websites to use reasonable care to provide true, reliable and secure information and fair contests.

79.     Defendants owed duties to Plaintiff and the proposed class to accurately describe the nature and quality of their DFS contests, including whether or not they are games of skill that provide all competitors an equal opportunity to use their skill and knowledge to win.

80.     Defendants owed Plaintiff and the proposed class a duty to advise them that competitors in possession of advantageous, non-public information were allowed to compete in the same DFS contests as competitors without such information.

81.     Defendants owed Plaintiff and the proposed class a duty to not engage in fraudulent or deceptive conduct, including misrepresentations and omissions concerning the lack of safeguards that would ensure fair contests.

82.     Defendants breached their duties to Plaintiff and the proposed class by failing to prevent competitors with non-public information and data from competing against Plaintiff and the proposed classes and by representing that their DFS contests were skill-based and fair.

83.     In the course of their business, profession and employment, Defendants and their agents, representatives and employees supplied false information to Plaintiff and the proposed class.

84.     Plaintiff and the proposed class justifiably relied upon the information supplied by Defendants, and, as a result, engaged in business with Defendants and lost money.

85.     Defendants failed to use reasonable care in communicating information about safety and security of data, employee access to data, and the ability of employees and others to use material, non-public data to compete against Plaintiff and the proposed class on other websites, or allow employees of other DFS websites and others with material, non-public access to compete on their DFS websites where Plaintiff and the proposed class competed.

86.     As a direct and proximate result of Defendants' negligence, Plaintiff and the proposed class were damaged in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**Fraud**
**(Plaintiff individually and on behalf of the Nationwide Class)**

87.     Plaintiff, on behalf of himself and the proposed class, hereby re-alleges the paragraphs above as if fully set forth herein.

88.     Defendants made material representations that were false, that defendants knew were false or were reckless as to the veracity and made with the inducement for Plaintiff and the class to act upon.

89.     Specifically, and as detailed herein, Defendants represented that their contests were fair games of skill.  Defendants also willfully failed to disclose that employees, agents, owners and/or others with non-public information and data competed in the same contests as Plaintiff and the class and enjoyed an increased chance to win, thereby decreasing Plaintiff and the class's ability to use skill to win.

90.     Plaintiff and the proposed class acted in reliance on the false, material representations and omissions made by Defendants, which caused them injury.

91.     Plaintiff and the proposed class would not have paid to compete in Defendants'
contests if they had known that they were competing against individuals who had access to and
the ability to use advantageous, non-public information and data.

92.     Defendants were aware that the integrity of the games was a material fact in
inducing Plaintiff and the proposed class to give them money in exchange for services and
agreeing to the alleged contract.  Defendants were aware that Plaintiff and the proposed class
paid to compete due to assurances that the contests were fair and based on skill.

93.     As a result of Defendants' fraudulent representations and fraudulent omissions,
Plaintiff and the proposed class were induced into an alleged contract that they otherwise would
not have made and suffered financial injury, harm and damages as described herein.

**THIRD CAUSE OF ACTION**
**Civil Conspiracy**
**(Plaintiff individually and on behalf of the Nationwide Class)**

94.     Plaintiff, on behalf of himself and the proposed class, hereby re-alleges the
paragraphs above as if fully set forth herein.

95.     As detailed above, Defendants engaged in a corrupt or unlawful combination
and/or agreement with each other to do an unlawful act, and continued to act in concert after the
act was discovered.

96.     Until October 6, 2015, neither Defendant prohibited its employees from
competing in DFS contests on each other's and other DFS websites.

97.     By affirmatively agreeing to allow employees at other DFS websites to compete
on their own websites against their own competitors and concealing and not disclosing this to
Plaintiff and the proposed class, Defendants committed negligence and/or fraud.  By
affirmatively permitting each other's employees and others with access to non-public

information to compete in DFS contests on its website, each Defendant assisted and encouraged the other's commission of negligence and/or fraud.

98.     Defendants knew that they lacked any meaningful internal controls to prevent employees' and others' access to material, non-public information about its contests that would provide a strategic advantage if used by them while competing in contests hosted by other DFS websites.  Defendants knew that its employees participated in DFS contests hosted by each other, and Defendants permitted such participation.  Defendants knew that the foregoing facts constituted a material "perk" to its employees that would enable them to pay its employees less than required absent such a "perk."  Defendants also knew that nondisclosure of these facts meant that its false and misleading advertising would generate artificially enhanced participation rates by unsuspecting consumers, which generated ill-gotten revenues and profits.

99.     Defendants' overt acts were done pursuant to or in furtherance of the conspiracy to allow their employees and officers to profit, continue to attract new competitors on their websites and otherwise profit because of their unlawful activities.

100.     Defendants gave each other assistance and encouragement in accomplishing the tortious result of their employees and others competing against and beating ordinary competitors on each other's DFS sites.  Because Defendants allowed their employees and others to secretly compete on each other's website, the practice was concealed from ordinary competitors.

101.     As a direct and proximate result of Defendants' concerted actions, Defendants are liable to Plaintiff and the members of the proposed class.

**FOURTH CAUSE OF ACTION**
**Violation of New Jersey Consumer Fraud Act**
**(N.J. Stat. § 56:8-1, *et seq*.)**
**(Plaintiff individually and on behalf of the New Jersey Subclass)**

102.   Plaintiff, on behalf of himself and the proposed class, hereby re-alleges the paragraphs above as if fully set forth herein.

103.   At all times relevant hereto, New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1, *et seq*. ("the CFA"), was in full force and effect.

104.   As discussed, Plaintiff and class members are consumers who entered Defendants' contests in New Jersey.  Defendants host such contests and promote them throughout the United States, including to Plaintiff and the proposed class.  This conduct affects trade and commerce.

105.   Section 2 of the CFA renders unlawful the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretenses, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment . . . in connection with the sale or advertisement of any merchandise . . . ."

106.   To gain competitors—especially "fish"—Defendants intentionally or knowingly concealed or omitted the material fact that employees from other DFS websites and others competed in their contests while in possession of non-public information and data.

107.   To gain competitors—especially "fish"—Defendants falsely promised or misrepresented that its contests were "fair" and that skill and knowledge made a difference between winning and losing.

108.   The participation of employees from other DFS websites and others with access to non-public information in contests is a material fact.  A reasonable competitor in DFS contests would consider this participation important in deciding whether to pay money to enter the same

contests.  Had Plaintiff known this material fact, he would not have paid for entry into contests and deposited money on DraftKings' website.

109.    By failing to disclose that employees from other DFS websites and others with access to non-public information participated in its contests and falsely promising or misrepresenting that its contests were "fair" and that skill and knowledge made a difference between winning and losing, Defendants have engaged in unlawful practices, including deception, fraud, false pretenses, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of a material fact.  These acts and practices offend established public policy, because the harm Defendants cause competitors outweighs any legitimate benefit associated with such practices.

110.    As a direct and proximate result of Defendants' unlawful conduct in violation of the CFA, Plaintiff and class members have been damaged, and they are entitled to a refund pursuant to N.J. Stat. Ann. § 56:8-2.11.

111.    Plaintiff and class members are also entitled to attorneys' fees, filing fees, and costs of suit, because Defendants committed the unlawful practices described here.

112.    Pursuant to N.J. Stat. Ann. § 56:8-20, Plaintiff will serve the New Jersey Attorney General with a copy of this class action complaint.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
**(Plaintiff individually and on behalf of the Nationwide Class)**

113.    Plaintiff, on behalf of himself and the proposed class, hereby re-alleges the paragraphs above as if fully set forth herein.

114.    Plaintiff and the members of the proposed class conferred a benefit on

Defendants by depositing money and paying to compete in contests on their websites, resulting in inequity.

115.    Defendants induced Plaintiff and other members of the proposed class to compete in DFS contests on their websites by promoting these contests as skill-based and taking place on a level playing field, when, in fact, Defendants permitted their own employees and others to exploit their access to material, non-public data and to participate with enormous success in contests hosted by each other.

116.    Defendants profited and were unjustly enriched by inflated levels of participation and increased entry fees, paid by consumers to compete in Defendants' contests while unaware that their odds of cusses were materially worse than advertised.

117.    Plaintiff and members of the proposed class were injured as a direct and proximate result of Defendants' misrepresentations and omissions because they paid for entry into contests and deposited money onto Defendants' websites, which they would not have done had they known the true facts.  Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiff and the members of the proposed classes is unjust and inequitable, Defendants must pay restitution to Plaintiff and the members of the proposed class for their unjust enrichment, as ordered by the Court.

**SIXTH CAUSE OF ACTION**
**Breach of Contract**
**(Plaintiff individually and on behalf of the Nationwide Class)**

118.    Plaintiff, on behalf of himself and the proposed class, hereby re-alleges the paragraphs above as if fully set forth herein.

119.    Defendants entered into contracts with their competitors by accepting their entry fees, and, in return, promising to provide them with DFS contests that were skill-based and

afforded Plaintiff and members of the proposed classes a fair opportunity to use their skill and knowledge to win.

120.    Defendants breached its contracts with competitors, because not all competitors have a fair opportunity to use their skill and knowledge to win.

121.    Defendants defrauded players and fraudulently induced Plaintiff and members of the proposed classes to enter into contracts for participation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the proposed classes pray for judgment, as follows:

a.    For an order certifying the proposed class and appointing Plaintiff and his counsel to represent the class;

b.    For an order awarding Plaintiff and class members monetary, actual, statutory, and punitive damages;

c.    For restitution to Plaintiff and the proposed classes of all monies wrongfully obtained by Defendants;

d.    For injunctive relief requiring Defendants to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

e.    An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendants' past conduct;

f.    For and order awarding Plaintiff and class members pre- and post-judgment interest;

g.      For an order awarding Plaintiff and the class members reasonable attorneys' fees,

filing fees, and costs of suit, including expert witness fees; and

h.      For an order awarding such other and further relief as this Court may deem just

and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: December 18, 2015                    RESPECTFULLY SUBMITTED,

By:     /s/ Paul C. Whalen
        Paul C. Whalen (PW1300)
        **LAW OFFICE OF PAUL C. WHALEN, P.C.**
        768 Plandome Road
        Manhasset, NY 11030
        (516) 426-6870 Telephone
        (212) 658-9685 Fax
        pcwhalen@gmail.com

        John A. Yanchunis
        **MORGAN & MORGAN**
        **COMPLEX LITIGATION GROUP**
        201 N. Franklin Street, 7th Floor
        Tampa, FL 33602
        (813) 223-5505 Telephone
        jyanchunis@forthepeople.com

        Edward A. Wallace
        Amy E. Keller
        Adam Prom
        **WEXLER WALLACE LLP**
        55 W. Monroe Street
        Suite 3300
        Chicago, IL 60603
        (312) 346-2222 Telephone
        (312) 346-0022 Facsimile
        eaw@wexlerwallace.com
        aek@wexlerwallace.com
        ap@wexlerwallace.com

Gregory F. Coleman
**GREG COLEMAN LAW PC**
First Tennessee Plaza
800 South Gay Street, Suite 1100
Knoxville, TN 37929
(865) 247-0080 Telephone
(865) 522-0049 Facsimile
greg@gregcolemanlaw.com

Joseph R. Santoli
**THE LAW OFFICES OF JOSEPH R.
SANTOLI**
340 Devon Court
Ridgewood, New Jersey 07450
(201) 926-9200 Telephone
(201) 575-2184 Facsimile
josephsantoli@aol.com

*Counsel for the Plaintiff and the Proposed Classes*